DECISION AND JUDGMENT ENTRY
Iris Norris and Robert Boling appeal the termination of their parental rights and the grant of custody of their children to Athens County Children Services ("ACCS") by the Juvenile Division of the Athens County Court of Common Pleas. Ms. Norris assigns the following error:
 I. THE EVIDENCE DID NOT SUPPORT THE DECISION OF THE COURT BY THE REQUISITE STANDARD OF PROOF, IN FINDING THAT THE CHILDREN COULD NOT BE REUNIFIED WITH A PARENT WITHIN A REASONABLE PERIOD OF TIME.
Mr. Boling assigns the following errors:
 I. THE JUVENILE COURT ERRED IN FINDING THAT "ATHENS COUNTY CHILDREN SERVICES DID MAKE REASONABLE EFFORTS TO REUNIFY THE CHILDREN WITH THEIR PARENTS."
 II. THE JUVENILE COURT ERRED IN FINDING THAT "REASONABLE EFFORTS TO EFFECTUATE REUNIFICATION WOULD BE FUTILE IN THIS CASE."
 III. THE JUVENILE COURT ERRED IN FINDING THAT BILLY BOLING AND ROBERT BOLING CANNOT BE PLACED WITH THEIR PARENTS WITHIN A REASONABLE TIME AND THAT THEY SHOULD NOT BE PLACED WITH THEIR PARENTS.
 THE JUVENILE COURT ERRED IN ADOPTING THE ATHENS COUNTY CHILDREN SERVICES' FINDINGS OF FACT AND CONCLUSIONS OF LAW THEREBY THE FAILING [sic] TO MAKE IT'S [sic] OWN INDEPENDENT FINDINGS OF FACT AND CONCLUSIONS OF LAW.
In light of the priority status of this case, we deviate from our normal practice and provide a review of the record and applicable law as an Appendix, which we incorporate in our decision.
 I.
In her assignment of error, Ms. Norris argues that the evidence presented did not support the finding that the children could not be reunified with either parent within a reasonable period of time. Ms. Norris contends that the court, in making its permanent custody determination, should only have considered the evidence occurring at or after the time of the second "taking" of the children in October 1999. She further submits that the events which occurred between October 1999 and the permanent custody hearing were insufficient to support the court's decision. We disagree.
In construing a statute, a court's paramount concern is the legislative intent in enacting the statute. State v. S.R. (1992), 63 Ohio St.3d 590,594. Under Ohio law, it is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent. In re Hayes (1997), 79 Ohio St.3d 46, 48, citing S.R., supra, at 594-595. In interpreting a statute, words and phrases shall be read in context and construed according to the rules of grammar and common usage. Independent Ins. Agents of Ohio, Inc. v. Fabe (1992),63 Ohio St.3d 310, 314; R.C. 1.42. Courts do not have the authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but must give effect to the words used. Wrayv. Wymer (1991), 77 Ohio App.3d 122, 130. In other words, courts may not delete words used or insert words not used. Cline v. Ohio Bur. of MotorVehicles (1991), 61 Ohio St.3d 93, 97.
R.C. 2151.414(E) specifically states that the court "shall consider allrelevant evidence" in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. (Emphasis added). Ms. Norris has not cited any cases which indicate that the evidence can only consist of information obtained at the time of or after the child's removal and the statute clearly does not place such limitations on the court. Evid.R. 401 defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Events occurring prior to removal of a child may well fit this definition and are not inadmissible per se because of their chronology.
Once the court finds that one or more of the situations outlined in R.C. 2151.414 (E)(1) through (16) exists, the court shall enter a finding that the child cannot or should not be placed with either parent. Here, as applicable to Ms. Norris, the court found that (E) (1), (2), (3), (8), (9), (14), (15) and (16) were all present. R.C. 2151.414(E)(1) is the only one of these provisions to require that the children services agency develop a case plan and make diligent efforts to remedy the problems that initially caused the child's removal from the home. A determination that this section is applicable can only be made if the parent has continuously and repeatedly failed to substantially remedy the conditions that caused the child to be placed outside his or her home. In this limited context, the court would be required to look only at the parent's conduct after removal of a child and development of a case plan in determining whether to award permanent custody to an agency.
In finding that this provision applied, the court relied on events that occurred from November 1997, when the children were initially removed, until the hearing. Based on Ms. Lehman's and Ms. Gribble's testimony, the court found that ACCS had diligently assisted Ms. Norris in remedying the problems in her home. The court found that despite this assistance, Ms. Norris failed to provide a stable home for the children and failed to protect them from harm. Specifically, the court found that Ms. Norris continued drinking though instructed not to by the court and ACCS on numerous occasions, continued associating with alcohol and drug abusers creating a dangerous environment for the children, and failed to attend parenting classes resulting in her lack of ability to properly care for her children. The court's determination that R.C. 2151.414(E)(1) is applicable is supported by competent, credible evidence and must be upheld.
In reaching this determination, the court properly relied on events occurring before Ms. Norris regained custody of her children in May 1999. The "initial removal" of the children occurred in November 1997. The children were returned to Ms. Norris but the case was not closed at that point and ACCS retained protective supervision over the children. InIn re Mark H. (Apr. 30, 1999), Lucas App. No. L-98-1238, unreported, the Sixth District reversed the trial court's grant of permanent custody when the court relied on events occurring in a prior, closed case because the appellant's children had been returned to her without conditions. Here, however, Ms. Norris was still required to comply with her case plan and was still receiving services from ACCS. Therefore, based on the plain language of R.C. 2151.414(E)(1), the court was authorized to consider the events occurring at the time when the children were first removed from Ms. Norris' home.
Furthermore, even if the court should have considered the initial placement under (E)(1) to be in October 1999, the court found that other provisions, which do not include similar limitations, also applied. R.C.2151.414(E)(2) provides that the court should not place the child with his or her parent if the parent's chronic chemical dependency is so severe that she cannot currently or within one year provide an adequate home for the child. The court found, and the evidence supports the finding, that Ms. Norris is an alcoholic and chemically dependent. The court noted that Ms. Norris admitted drinking on several occasions after she was ordered not to. Perhaps most importantly, Ms. Norris has failed to recognize that she is an alcoholic even though virtually every witness, including her own grown children, declared her to be one.
The court found that Ms. Norris made several contradictory statements regarding the extent and length of her drinking. Further, the court found that Ms. Norris minimized the amount of alcohol she'd consumed when she was "caught" by Ms. Wikle and rejected treatment from RWRP even after she was told she could lose custody of her children if she did so. In sum, the court concluded that Ms. Norris' testimony that she now has control over her consumption of alcohol is not credible given her history of severe alcoholism and chemical dependency, her contradictory statements, and her continued associations with those who contribute to or allow her to be dependent. Since Ms. Norris is still unwilling to acknowledge and successfully treat her problem, she is unable to provide an adequate home for the children and will likely not be able to within the next year. These findings are also supported by competent, credible evidence.
Because we have found that the court's determination that R.C.2151.414(E)(1) and (2) apply is supported by competent, credible evidence, we need not determine whether (E)(3),(8),(9),(14),(15), and (16) are applicable. If the court finds that even one of these conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.
According to Ms. Norris, her friends and family, she is attempting to turn her life around. However, there is also evidence that Ms. Norris has made numerous such attempts and failed over the years. Further, even if Ms. Norris is no longer drinking, she admits that she is still associating with people that she has been ordered not to see and has failed to comply with other requirements of her case plan, including attending parenting classes. These failures prevent her from providing the adequate permanent home that her children need. As the choice between conflicting testimony of witnesses rests solely with the finder of fact, an appellate court many not substitute its judgment for that of the trier of fact. State v. Awan (1986), 22 Ohio St.3d 120, 123. Therefore, we rely on the trial court's determination regarding the credibility of Ms. Norris' testimony.
 II.
In his third assignment of error, Mr. Boling contends that the court erred in finding that Billy and Robert cannot be placed with their parents within a reasonable time and that they should not be placed with their parents. As pertains to Mr. Boling, the court found that R.C.2151.414(E)(2),(3),(4),(10),(12),(14) and (15) apply. Mr. Boling contends that none of these factors are present and the court should have awarded him custody of the boys upon his release from SEPTA.
The court made various findings to support its conclusion that these factors were present. The court found that Mr. Boling is an alcoholic and chemically dependent. Further, the severity of his abuse makes him unable to care for his children now and in the upcoming future. The court also found that Mr. Boling committed many acts of abuse towards Ms. Norris and the children as a result of his alcoholism. The court noted that the boys have had no contact whatsoever with Mr. Boling since November 1997. While it is true that a restraining order was in place preventing such contact, Mr. Boling never made any attempts to contact the court or ACCS to remove or lessen the restraining order. The court also found that "Mr. Boling's eleventh hour repentance is unconvincing." This statement indicates that the court did not credit Mr. Boling's testimony regarding his control over his alcoholism and drug abuse and his ability to provide a stable home for the boys upon release from prison. Again, the court was the trier of fact and was free to discount Mr. Boling's testimony.
R.C. 2151.414(E)(15) states that if the court finds that the parent has committed abuse or allowed the child to suffer neglect, and the court determines that the seriousness, nature or likelihood of the recurrence of the abuse or neglect makes the child's placement with the parent a threat to the safety of the child, the court must find that the child cannot or should not be placed with the parents. Here, there was ample testimony that Mr. Boling had virtually no positive interaction with his children even when he resided with them. There was also testimony that Mr. Boling shoved food in Robert's face because he was not eating fast enough and held him over a well, and that Mr. Boling slapped the children. In addition, Ms. Norris' grown daughters testified that Mr. Boling regularly abused Ms. Norris in front of the children, causing them to scream and cry. There was also testimony that the children witnessed Mr. Boling beating Ms. Norris almost to death in November 1997 and the children suffered serious psychological damage as a result of this experience. Mr. Boling testified that he turned his life around in prison but it is clear that the trial court did not credit this testimony. There is competent, credible evidence to support the lower court's finding that Mr. Boling abused and neglected his children. Furthermore, the seriousness and frequency of the abuse and neglect provides amble support for the court's finding that placing the boys with Mr. Boling would seriously endanger their health and safety. Because there is competent, credible evidence to support the conclusion that R.C. 2151.414(E)(15) is present and only one factor need be found under R.C. 2151.414(E), we need not determine whether the remaining factors found by the court are also present.
 III.
We conclude that there is competent, credible evidence that at least one factor listed in R.C. 2151.414(E) is present here as pertains to Mr. Boling and to Ms. Norris. Mr. Norris' whereabouts are unknown and he has had no contact with Kristal so clearly she cannot be placed with him. Because sufficient evidence supports the trial court's findings, we hold that the court did not err in finding that the children could not be placed with either parent within a reasonable time and that they should not be placed with their parents.
Ms. Norris' assignment of error is overruled and Mr. Boling's third assignment of error is overruled.
 IV.
In his first and second assignments of error, Mr. Boling contends that the court erred in finding that ACCS made reasonable efforts to reunify the children with him and in finding that reasonable efforts to effect reunification would be futile.
R.C. 2151.419(A) directs the trial court at any hearing where the child is committed to the permanent custody of an agency to determine whether the agency has made reasonable efforts to return the child home. An implied exception may exist where reasonable efforts would be futile. SeeIn re Crosten (Mar. 21, 1996), Athens App. No. 95CA1692, unreported. However, the appearance of futility may be furthered by agency acts or omissions. In re Stevens (July 16, 1993), Montgomery App. No. 13523, unreported. Trial courts should be cautious in finding that reasonable efforts would have been futile where an agency ignores a natural parent.Id. In In re Efaw (Apr. 21, 1998), Athens App. No. 97CA49, unreported, we cautioned trial courts that where an agency has chosen to ignore a natural parent, a finding of futility should be made only after careful consideration of how the agency's inaction contributes to the appearance of futility.
Here, the trial court found that efforts to reunite the boys with their father would be futile because Mr. Boling is a chronic alcoholic with deep-seated anger problems who severely beat Ms. Norris where the children could see and hear his actions. Based on these facts and the testimony of Ms. Norris, Anita Hudnell, and Karen Blevins, as well as Mr. Boling's own testimony, the court found that reunification would have been futile. We agree.
Mr. Boling asserts that ACCS took no actions to determine his release date and should have included him in the case plan for reunification. However, the evidence shows that ACCS knew Mr. Boling was incarcerated for a relatively lengthy period. Ms. Gribble testified that she recorded in the case file that Mr. Boling was found guilty of his crime and would be incarcerated for four years. Further, one of the early case plans noted that Mr. Boling was currently incarcerated and Ms. Lehman testified that she phoned the prison in December 1999 and was told that Mr. Boling would not be released for two more years. Mr. Boling faults ACCS for not learning that he had been judicially released. However, this occurred after the motion for permanent custody had been filed and only shortly before the hearing. ACCS had no reason to believe that Mr. Boling would be released any sooner than 2002.
In Efaw, supra, we indicated that agencies should either adopt reunification plans involving fathers or explicitly state in the case plan why it would be futile to do so. While it may not have been explicit, the case plan indicated that Mr. Boling was incarcerated and all the parties involved knew Mr. Boling's legal status. Given that this status was not scheduled to change for some time, it is clear why ACCS did not include Mr. Boling in the reunification plan with Ms. Norris. Furthermore, in Efaw, we found that the father's lack of interest in his son, failure to communicate with him, failure to financially support him, and history of alcohol abuse, drug abuse, and crime supported the court's finding of futility despite the children services agency's failure to include him in the case plan. Here, Mr. Boling had a history of alcohol and drug abuse, a severe temper, was physically abusive to Ms. Norris and the children, and had failed to communicate with his children in two-and-a-half years. Further, the evidence showed that the boys had virtually no relationship with their father even when he was living with them. Therefore, the court's finding that reasonable efforts to reunite the boys with their father would be futile is supported by competent, credible evidence.
Because we agree with the trial court that reasonable efforts to reunite the boys with Mr. Boling would have been futile, we need not determine whether the court correctly found that ACCS made reasonable efforts to reunite Robert and Billy with their father. Mr. Boling's second assignment of error is overruled and his first assignment of error is moot.
 V.
In his fourth assignment of error, Mr. Boling argues that the court erred in adopting ACCS's findings of fact and conclusions of law and not making independent findings. We disagree.
In Kaechle v. Kaechle (1991), 72 Ohio App.3d 267, the appellate court held that while the blanket adoption of one party's proposed findings of fact breeds error, the practice does not constitute error per se and was not an abuse of discretion. We acknowledge that the trial court substantially adopted ACCS's findings of fact and made only some minor changes. However, where proposed findings of fact and conclusions of law are an accurate reflection of the record and the law, it is not error for the trial court to adopt them. Therefore, we overrule Mr. Boling's fourth assignment of error.
 VI.
Having found no merit in any of Ms. Norris or Mr. Boling's assignments of error, we affirm the judgment of the trial court granting permanent custody of the children to ACCS and terminating the appellants' parental rights.
JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
Kline, P.J. Evans, J.: Concur in Judgment and Opinion
 ____________________________ William H. Harsha, Judge
Please attach to Judge Harsha's 12/12/00 opinion.
APPENDIX
The Record
On November 11, 1997, Mr. Boling severely beat Ms. Norris. Both parties were intoxicated at the time and Mr. Boling had also ingested valium. As a result of the beating, Ms. Norris was comatose and was hospitalized for a lengthy period of time. Following her hospitalization, she required rehabilitative treatment and still suffers some permanent disabilities from her injuries. Following this incident, Mr. Boling fled to Florida to avoid prosecution. He was captured after approximately two months and returned to Ohio where he pled guilty to felonious assault and was sentenced to four years imprisonment, beginning May 11, 1998.
The day following the assault, ACCS applied for and received an order of emergency temporary custody of Kristal (D.O.B. 2/26/88), Billy (D.O.B. 7/7/93), and Robert (D.O.B. 10/26/94). The children were placed in foster care with the McMillan family and a case plan was filed shortly thereafter indicating a goal of reunification with their mother. The case plan noted that Ms. Norris needed to make several changes including providing a home free from domestic violence, alcohol and marijuana, learning appropriate discipline techniques, and learning not to abuse alcohol.
In January 1998, the court ordered that Mr. Boling not have any contact with Ms. Norris or the children. In February 1998, the court adjudicated the children dependent based on Ms. Norris' inability to care for them due to her injuries. Mr. Boling was again ordered not to contact Ms. Norris or the children. An amended case plan was filed noting that Kristal's father's whereabouts were unknown and that Mr. Boling was currently incarcerated in Florida so no services could be offered.
Marie and Shirley Johnson, Ms. Norris' sister and brother-in-law, agreed to take legal custody of the children and the court transferred custody to the Johnsons with ACCS retaining protective supervision. Ms. Norris was ordered to maintain an adequate, stable, violence-free home and to be assessed for alcohol treatment. She was also ordered to follow through with any recommendations made regarding treatment.
While the children lived with the Johnsons in Lawrence County, Ms. Norris lived in a mobile home on their property. The purpose of this arrangement was to allow Ms. Norris to recover from her injuries without worrying about the care of the children. Her close proximity allowed her to gradually increase her responsibility for the children and see them on a regular basis.
According to Laurie Gribble, the ACCS caseworker assigned to Ms. Norris' case at the time, ACCS provided Ms. Norris with transportation, counseling referrals and drug and alcohol counseling during this period. Ms. Norris attended counseling sporadically though she did attend some Alcoholics Anonymous (AA) meetings for approximately four to five months. The children notified Ms. Gribble that their mother was leaving during their weekend visitations with her and going to Athens and Meigs Counties. Teena Nelson, a Lawrence County Social Services caseworker also assigned to the case, notified Ms. Gribble that Ms. Norris was still drinking in the spring of 1998. Ms. Norris told Ms. Gribble that she had problems controlling the boys because they were hyper. She was taking pills to control her nerves but she sometimes had to take a drink to calm her when it got too bad. In March 1998, a second amended case plan was filed changing the goal from reunification to permanent placement with the Johnsons.
John Curtiss, a former employee of the Family Guidance Center in Ironton, Ohio, testified that Ms. Norris was diagnosed with dominant alcohol abuse in March 1998. She indicated that she first started using chemicals and beer at age twenty-five and had one arrest for driving under the influence approximately eight years prior. She completed Project First Step, a group substance abuse program but denied that she was an alcoholic. On one occasion, a staff member smelled alcohol on Ms. Norris' breath though Mr. Curtiss did not personally smell it. Mr. Curtiss testified that Ms. Norris showed increased knowledge on the post-program test and interacted in some of the later sessions.
In December 1998, ACCS filed a motion to modify the disposition from protective supervision to temporary custody with ACCS. In its motion, ACCS indicated that the Johnsons wished to terminate their legal custody of the children because Ms. Norris was still drinking and was not spending time with the children. In January 1999, the court awarded temporary custody of the children to ACCS for six months but the children remained with the Johnsons.
Shortly thereafter, a third amended case plan was filed and the goal was changed back to reunification with Ms. Norris. The plan noted that Ms. Norris needed to attend drug and alcohol counseling, submit to urine screens and follow the counselor's recommendations. Further, no one visiting the home should be intoxicated or drinking alcohol.
In May 1999, legal custody of the children was returned to Ms. Norris but ACCS retained protective supervision. A fourth amended case plan was filed shortly afterwards stating that Ms. Norris must maintain complete sobriety, avoid others who abuse alcohol, not allow alcohol in the home, attend counseling at the Family Guidance Center, attended weekly AA meetings and permit random urine screens.
In August 1999, Rebecca Lehman, a caseworker for ACCS made a home visit to Ms. Norris' home. At the time, Ms. Norris was living in a trailer owned by Harold Barnhart. Ms. Lehman testified that the trailer was run-down. Ms. Norris told Ms. Lehman that one bedroom was Harold's, one was the boys' with a twin bed, and one was Kristal's. Ms. Norris slept on the couch. The walls of the trailer consisted of exposed insulation covered with plastic. The refrigerator and freezer had very little food. Ms. Lehman told Ms. Norris that Mr. Barnhart was a known alcoholic and living there was in conflict with her case plan. Ms. Lehman offered to help Ms. Norris find an appropriate apartment.
Jenny Byers, a counselor at Tri-County Mental Health and Counseling, testified that she assessed Ms. Norris on September 3, 1999 and eventually diagnosed her with anxiolytic dependency (specifically benzodiazepines) and alcohol dependency. Ms. Byers recommended that Ms. Norris meet with her once a week until she could begin attending the Substance Abuse and Mental Illness (SAMI) intensive outpatient group. Ms. Byers also spoke to Ms. Norris about attending a residential treatment program and Ms. Norris later agreed to attend the Rural Woman's Recovery Program (RWRP).
Marsha Lee Wikle, the guardian ad litem for the children, testified that she visited Ms. Norris' home in September 1999. When she arrived, Ms. Norris was sitting in the front passenger's seat of Cecil Stacey's car with the door open. Mr. Stacey was in the driver's seat. There were five or six fresh-looking beer cans laying next to the car on Ms. Norris' side. Ms. Wikle spent approximately one hour talking to Ms. Norris who never left the vehicle or turned to face Ms. Wikle. Ms. Norris appeared hunched over, incoherent and emotional, leading Ms. Wikle to believe she was intoxicated.
While Ms. Wikle spoke to Ms. Norris, the children went through Ms. Wikle's vehicle looking for food and drinks. They found a partial can of cola and a partial bottle of cranberry juice and drank both. Ms. Wikle encouraged Ms. Norris to leave the vehicle and feed the children but Ms. Norris still did not stand up. Ms. Wikle testified that Mr. Stacey did not appear intoxicated.
Ms. Wikle visited again a few days later. On that occasion, Ms. Norris had already fed the children though Ms. Wikle brought food with her because of her prior experience. The contrast in Ms. Norris' behavior confirmed Ms. Wikle's suspicion that Ms. Norris had been drinking a few days earlier. Ms. Wikle asked Ms. Norris about the beer cans and she admitted having three or four beers.
Ms. Lehman also went to Ms. Norris' home to inquire about the incident. Ms. Norris admitted drinking two beers and stated that Mr. Stacey had two beers. Ms. Norris also stated that Robert had been in the car. There was little food in the refrigerator though Robert stated that he had eggs for breakfast. One of the rooms in the trailer was filled with trash and there were numerous flies throughout the trailer. Ms. Norris indicated that she was attempting to move to the Carriage Hill apartments, which she eventually did in December 1999.
On October 4, 1999, Ms. Lehman conducted a semi-annual review with Ms. Norris at the ACCS office. When Ms. Lehman went to pick Ms. Norris up, she stopped at the laboratory for a drug and alcohol screen. Ms. Norris told Ms. Lehman that the test would not be clean because her birthday was the prior weekend and she had a couple of beers.
During the meeting, a case aide noticed a small, circular burn on Robert's knee that appeared scabbed over. The burn appeared to be shaped like a cigarette. Because the scab was above the knee and not on the front of it, it did not look like he fell and scraped it. Robert stated that his sister had punched him there. When asked if his mother did anything to make it feel better, he said no.
In October 1999, ACCS filed a motion for emergency custody. In their motion, ACCS noted that Ms. Norris had not complied with the case plan in that she did not maintain sobriety, did not attend counseling or regular AA meetings, did not submit to random urine screens and had not avoided other alcohol abusers. ACCS also indicated that the home the children were living in was not safe and there was little food in the home. Also, Robert had a cut under his eye and a burn on his leg that appeared to result from a cigarette. Emergency custody was granted to ACCS and the children were again placed in foster care with the McMillans.
Jill Newstate, a registered nurse, testified that she examined Robert after his removal from his mother's custody. Robert had a one-half centimeter cigarette-like burn on the right lateral of his tongue. His left knee had an open round sore with a multi-layered scab. He also had blisters on his feet and scattered scabs on the right side of his face. Ms. Newstate did not know how Robert received the burn or the wound or how old either was.
In November 1999, a fifth amended case plan was filed, adding an additional case plan objective. Based on the recommendation of Jenny Byers, Ms. Norris' counselor at Tri-County Mental Health and Counseling, ACCS added the objective of inpatient alcohol treatment.
Ms. Lehman testified that she visited Harold Hudnell's trailer on November 10, 1999. Mr. Hudnell and Ruth, Ms. Norris' sister, were drinking. Ruth asked Ms. Lehman, referring to Robert, "How is the little red-headed fucker doing?" Two days later, Ms. Norris told Ms. Lehman, in front of the children, that Mr. Hudnell and another male friend had a debate about who would take Ms. Lehman out and they made a comment about her legs. Ms. Lehman told Ms. Norris that this was inappropriate to say in front of the children.
Ms. Norris entered the RWRP in the beginning of January 2000 and remained there approximately two weeks until January 24, 2000, though the normal program length is one to three months. Kathryn Chelak, Ms. Norris' counselor at RWRP, testified that Ms. Norris gave her varying reports of how long it had been since her last drink. Ms. Norris stated that it had been two to three months on one occasion and a week or so on another occasion. Ms. Norris told Ms. Chelak she had been drinking intermittently for ten to fifteen years.
Ms. Chelak testified that Ms. Norris failed to recognize that many of her problems stemmed from her drinking. She participated only minimally in the groups at the clinic. Her statements indicated that while she was physically present, she did not feel the issues pertained to her. Ms. Norris and Ms. Chelak attended a meeting on January 18, 1998 with Ms. Byers, Ms. Lehman and other employees of RWRP to identify why Ms. Norris needed to be in treatment. Ms. Lehman informed Ms. Norris that her completion of the program was important to the determination of her children's custody and that she was in danger of permanently losing her children if she failed to comply with the recommendations of her counselor as required by her case plan. This information caused Ms. Norris to cry and she appeared upset. Despite this meeting, Ms. Norris left RWRP against the staff's advice.
After Ms. Norris left, Ms. Byers recommended that she attend the SAMI group, attend weekly counseling and attend AA meetings five times per week until a place in the SAMI group was available. Ms. Norris attended approximately fifteen AA meetings between February 2 and February 23, 2000. She began attending the SAMI group on March 6, 2000. Ms. Byers testified that Ms. Norris appeared healthier and was taking better care of her appearance now than when she first met her. She also appeared to have more will and motivation. Ms. Byers noted that it was important that Ms. Norris have a relapse prevention plan including a support network of people she can rely upon who do not drink or use substances.
In January 2000, ACCS filed a motion for permanent custody. In its motion, ACCS indicated that Mr. Boling was not eligible for parole until February 2002, that attempts to locate Mr. Norris had failed, and that Ms. Norris had not complied with her case plan and was unable to care for the children. The court conducted a four-day hearing in May 2000.
Iris Norris testified that she has lived in a three-bedroom apartment since December 23, 1999. She lived in Harold Barnhart's trailer from August or September 1999 until she moved into her apartment. While she lived in Mr. Barnhart's trailer, a friend of his would sleep there during the day while the children were at school but she could not recall his name. Prior to that, she lived in a trailer on her sister, Marie's, property in Lawrence County.
Ms. Norris testified that the children were not present on the night Mr. Boling beat her. As a result of the beating, she had a blood clot on her brain, a broken neck, a dislocated hip, her arms were pulled out of their sockets, and her teeth were kicked out. Ms. Norris testified that prior to that incident, Mr. Boling slapped her around almost every day, usually when the children were in bed. She did not know if the children heard but it was loud enough to wake the neighbors. On two occasions, Ms. Norris obtained a restraining order against Mr. Boling, but he continued to live with her and the children. She stayed with Mr. Boling because he told her the boys needed their father. Ms. Norris testified that Mr. Boling was not close to the boys and has not seen or contacted them since November 1997. Ms. Norris testified that she did not see a burn mark on Robert in October 1999 and she does not believe he had one. She stated that she is the only person who smoked and she would not burn her children. Ms. Norris surmised that Robert may have gotten her lighter and "flicked it on his leg or something." She stated that he knows how to light the lighter and a cigarette.
Ms. Norris testified that she did not drink when she was in her twenties and started drinking about eight years ago. She previously attended an outpatient alcohol counseling program two or three times a week. She recently completed the SAMI program and intended to continue with the next stage of the program. She left RWRP because she didn't like her roommate and doesn't consider herself an alcoholic. Ms. Norris also testified that an unknown doctor at RWRP told her she was not an alcoholic because she did not have the "shakes" after two or three days. She stated that Becky Lehman never informed her that she may lose her children if she left RWRP and she would have stayed if she had that information. Ms. Norris also testified that she attended AA meetings for five weeks until she entered the SAMI program, but does not know which of the twelve steps she completed.
Ms. Norris testified that she has not had a drink in almost eight months. Even when she was drinking, she only drank about a six pack of beer per week. Ms. Norris testified that when she drank she got a babysitter and did not drink around her children. She stated that the last time she drank was on her birthday in October 1999 and she limited herself to five beers on the weekend. Ms. Norris admitted that when Ms. Wikle saw her drinking with Mr. Stacey, he had been driving with her children in the car after drinking beer. She also testified that she does not allow others to drink in her home, though many of her friends drink.
Ms. Norris testified that she believes she has done everything ACCS asked her to do. She testified that she had food in the house and cooked for the children when they lived with her. However, Ms. Norris admitted that she did not attend parenting classes though the caseworkers had suggested them. She stated that she didn't know why she did not attend, she either didn't have time or did not want to. However, she would attend them in order to regain custody of her children. Ms. Norris testified that she would not start drinking again because her children meant too much to her. She also indicated that she would stop associating with her friends and her sister if it meant getting her children back.
Ms. Norris testified that her sister, Ruth, visits infrequently to assist Ms. Norris with her laundry and cooking. She further stated that people who drink alcohol were allowed in her home as long as they were sober and didn't bring alcohol with them. Ms. Norris testified that she has a relapse prevention program in place. If she feels like having a drink she will talk to a family member or friend, get a hobby, call someone from AA, talk to her sponsor, or go to an AA meeting. Ms. Norris testified that she last spoke to her sponsor eight weeks ago.
Cecil Stacey testified that he has known Ms. Norris since 1982 and they have two sons together who live with Mr. Stacey. Ms. Norris was in her late twenties when they lived together and she drank beer then but he never saw her smoke marijuana. The last time Mr. Stacey saw Ms. Norris was when he brought her home and the guardian ad litem visited Ms. Norris' home. He was unsure of the date but indicated that the kids did not seem hungry and Ms. Norris had plenty of groceries. He testified that Ms. Norris drank approximately three or four beers on that date. Later in his testimony, Mr. Stacey indicated that he saw Ms. Norris at Harold Hudnell's home around Christmas time. Mr. Stacey testified that Mr. Hudnell drinks and is a good friend of Ms. Norris. Mr. Stacey also knows Harold Barnhart, who drinks a lot, though Mr. Stacey never saw Ms. Norris drink with him. Mr. Stacey testified that Ms. Norris has a drinking problem, but he did not believe she is currently drinking.
Marsha Lee Wikle testified that she has visited Ms. Norris' new apartment on two occasions, but Ms. Norris was not home either time. She has also attended several visits between Ms. Norris and her children. During these visits, Ms. Norris was not observant of the children's behaviors. When she did reprimand the boys, they ignored her even when they were doing something dangerous. The boys would leave Ms. Norris and she would not know where they'd gone or attempt to follow them. Kristal paid more attention to her mother though.
Ms. Wikle testified that the children interact more with their foster parents than with Ms. Norris. Ms. Wikle has had no personal contact with Mr. Boling or Mr. Norris. Mr. Boling was in Florida when she was first assigned to the case and then was incarcerated. Ms. Wikle recommends that permanent custody be granted to ACCS because Ms. Norris has had several opportunities to redirect her life and has failed to do so, though ACCS provided her with many resources. Ms. Wikle indicated that even if Ms. Norris is currently sober, she does not believe that placement of the children with her would be appropriate as Ms. Norris has never been able to maintain her sobriety with the children in the home.
Cynthia Warren, a counselor at Tri-County Mental Health and Counseling Services, testified that she has worked with all three children to stabilize their moods and behaviors. When she first began counseling, Kristal exhibited signs of anxiety and depression. She also had a low self-image and was very withdrawn. Kristal has improved and has begun to talk about difficulties and make more eye contact. Robert was highly emotional when he first began seeing Ms. Warren. He would become extremely upset about small things and easily frustrated. He is now more relaxed and his moods are more stable. Billy was extremely hyperactive when he began counseling. He was difficult to focus and would move from one activity to another very rapidly. He is now much more stable, relaxed and friendly. Billy and Kristal were diagnosed with adjustment disorder with mixed anxiety and depression. Robert was diagnosed with adjustment disorder with mixed emotions and conduct. Ms. Warren testified that Kristal has warm feelings towards her mother, but she recommends that all three children remain in their foster home.
Anita Hudnell testified that she is twenty-three years old. Ms. Norris is her mother and Harold Hudnell is her father. Ms. Hudnell testified that her mother has admitted she's an alcoholic and that when Ms. Hudnell was a child her mother laid around and drank all the time, though she always had food for the children. Ms. Hudnell further testified that Ms. Norris was mean when she drank and that she and Mr. Boling would get into fights in front of the children, cussing and spitting at each other. The children would scream and cry when they saw the fights.
Ms. Hudnell testified that Mr. Boling was cruel to Ms. Norris, burning her legs with cigarettes and spitting on her. He was also mean to Billy and Robert. On one occasion, when Billy was about one-and-a-half years old, Mr. Boling crammed Billy's mouth full of food, held his hand over his mouth and nose, and held him by his feet over the top of the well and said he was going to drop him in it. Ms. Hudnell also saw Mr. Boling slap Kristal in the face within the last five years. Mr. Boling was a heavy drinker who drank every day Ms. Hudnell was at their home. Ms. Hudnell testified that Mr. Boling would not be an appropriate caretaker for the boys because he is too mean and she would be scared to have him around her brothers. Ms. Hudnell testified that the last time Mr. Norris had contact with Kristal was in 1993 or 1994.
Ms. Hudnell also testified that she believes Ms. Norris could provide a stable household for the children now. She has quit drinking and has her own place to live. Ms. Hudnell has seen other people, including Harold Barnhart, drinking in Ms. Norris' current home but has not seen her drink. Ms. Hudnell admitted that Ms. Norris has quit drinking in the past but started drinking again.
On re-direct examination, Ms. Hudnell admitted that she has smoked marijuana with her mother before though the last time was several years prior. She also testified that her aunt, Ruth, helps her mother with laundry and other chores and stays with her mother part-time. Ruth sometimes drinks heavily.
Karen Blevins, Ms. Norris' twenty-five-year-old daughter, testified that Ms. Norris and Mr. Boling fought all the time. They also drank a lot, sometimes until one or two a.m. Ms. Blevins observed Mr. Boling smack Kristal and Billy once. She also testified that she never saw the boys with Mr. Boling when Ms. Norris was not around or saw him taking care of them on his own. The last time she saw her mother drink was in October 1999.
Ms. Blevins also testified that a mouse bit Robert on the finger while Ms. Norris and the children were living in Harold Barnhart's trailer. He had a fever but Ms. Norris never took him to the doctor. Ms. Blevins indicated that he did not appear to be too sick.
On cross-examination, Ms. Blevins testified that when she was approximately fifteen years old she would take care of Kristal sometimes when her mother was out drinking. She also cooked for her mother when she was intoxicated. Ms. Blevins stated that when she picked Ms. Norris up for court one morning during the hearing, Harold Barnhart was at Ms. Norris' apartment. Mr. Barnhart has a reputation as a drinker.
Shirley McMillan, the children's foster mother, testified that she had the children in her care in 1997 until they went to their aunt's home and again in October 1999. The first time they came into her care, the children were hyper, vomited a lot, and "messed in their pants." A physician could find no physical cause for these behaviors. The children also seemed not to care about very much and were educationally behind when they entered Mrs. McMillan's care. The children were excited about going to live with their aunt and uncle and their behaviors had generally improved when they left in February 1998.
However, when they returned to the McMillan home in October 1999, many of these bad behaviors were present again. The boys appeared "wilder" the second time and also exhibited sexual behavior. On one occasion, Robert jumped on Mrs. McMillan's son's leg and said he was going to "hump him." Mrs. McMillan asked Robert what he meant by that and he stated that you kiss, jerk your clothes off, run in the bedroom and hump. When she asked where he learned that, Robert stated that his Aunt Ruth does it all the time. Billy frequently plays with his genitals and Robert jerks his pants up and down, telling people to look at him. Robert told Mrs. McMillan that his Aunt Ruth told them to do these things. These behaviors are usually especially bad for about two days after they visit with their mother. Kristal writes letters to boys and has made inappropriate comments to Mrs. McMillan's sixteen-year-old grandson.
The two boys are now taking ritalin which has decreased their hyperactivity. They are also beginning to learn right from wrong. Mrs. McMillan testified that the children tell her they love her and seem happy. She is willing to have the children remain in her home though no one has asked her about adopting them. Mrs. McMillan has not met Mr. Boling and he has never contacted her or the boys.
Ms. Lehman testified that ACCS provided numerous services to Ms. Norris including transportation, counseling, visitations, information referrals, testing for the children, help locating an apartment, and money for furniture. Ms. Lehman contacted the children's siblings as well as the Johnsons regarding custody. The agency was unable to locate most of their paternal family. None of the relatives wished to have the children placed with them.
Ms. Lehman indicated that the Carriage Hill apartment seems appropriate, but that Ms. Norris is still associating with family and friends who are known to abuse alcohol and other substances. During visitation with the children, Ms. Norris generally brings junk food and/or toys that the children are very interested in. Kristal interacts with her mother but Ms. Lehman expressed concern regarding their conversations. On one occasion, Kristal told her mother she received a note from a boy calling her a "sexy thing" and Ms. Norris laughed. Ms. Lehman told Ms. Norris that such behavior was inappropriate. Ms. Lehman indicated that the children hug their mother when they arrive and when they leave.
While Ms. Norris has made strides in what she has been asked to do, Ms. Lehman stated that she has never taken responsibility for what has happened to the children. Ms. Lehman expressed concern because Ms. Norris' support network consists of alcohol and drug users who are not a secure safety net for herself or her children. Mr. Boling has had no interaction with the children and Ms. Lehman has been unable to locate Mr. Norris. Ms. Lehman testified that she did not have any contact with Mr. Boling because he was incarcerated. When she contacted Warren Correctional Institution on December 16, 1999, she was told he was not eligible for release for two more years so she did not include him in the case plan. She recently learned that he is currently at SEPTA.
Ms. Lehman believes Ms. Norris has failed to comply with the case plan and that her home would not be a safe and stable home for the children. Ms. Lehman expressed concern regarding the people Ms. Norris associates with, especially Ruth Donahue, as well as her failure to complete inpatient treatment and her lengthy history. Ms. Lehman admitted that Ms. Norris has had no positive urine screens but noted that alcohol leaves the body quickly and is therefore difficult to detect. She noted that her observations indicate that Ms. Norris does not have the skills to protect her children or to discipline them and sometimes did not recognize dangerous situations.
Mr. Boling testified that he is currently residing at SEPTA but prior to that he was at the prison in Warren after pleading no contest to felonious assault. He testified that on the evening of the assault, he drank whiskey and beer and took some valium. He does not recall hurting Ms. Norris but believes he did so. Mr. Boling testified that the children were approximately fifty yards away at the time but he does not believe they heard anything. The morning after the assault, Mr. Boling took Ms. Norris to the hospital and brought the children to Harold Hudnell's home. He then fled to Florida because he was scared.
During his prison stay, Mr. Boling passed the adult basic education test, attended a pre-GED class, and earned certificates for classes in self-discipline, self-awareness, anger management, and chemical dependency and alcohol addiction. He is still working on his GED. Mr. Boling testified that he learned that he is an alcoholic and how alcohol affects one's body. He has been clean for two years now and does not intend to start drinking again when he is released from SEPTA. Mr. Boling testified that there were opportunities to consume alcohol and marijuana in prison but that he did not do so.
Mr. Boling also testified that he would like to be reunited with his sons someday and would be willing and able to provide a home for them. He could earn a living painting either in Ohio or in Florida, where his brother owns a painting business. Mr. Boling was aware of the order prohibiting him from contacting his sons. He did not, however, know the boys had been removed from Ms. Norris' care until January 2000 when he received papers from the court. That was his first opportunity to apply for counsel.
Mr. Boling denied ever physically harming or smashing food in his sons' faces. He also indicated that he treated Kristal just like he did his own sons. Mr. Boling testified that he had not hit Ms. Norris when she got the restraining order but admitted hitting her in the head once when he was upset. He indicated that Ms. Norris was violent toward him, slapped him and broke his nose once. Mr. Boling testified that Ms. Norris is a good mother when she is not drinking and hanging around a bad crowd, including Harold and Anita Hudnell and Ruth Donahue.
Mr. Boling testified that he received a judicial release because he stayed out of trouble, went to classes, and wrote the judge a letter. He was scheduled to be released from SEPTA on September 16, 2000.
Following the hearing, the court granted ACCS's motion for permanent custody and terminated the parental rights of Iris Norris, Robert Boling and Michael Norris. Mr. Boling requested findings of fact and conclusions of law that the court issued. Both Ms. Norris and Mr. Boling appealed from this judgment.
B. The Applicable Law
In considering a motion for permanent custody filed under R.C. 2151.413, the trial court must follow the guidelines delineated in R.C. 2151.414. R.C. 2151.414(A)(1) requires the trial court to conduct a hearing to determine whether the child's best interests would be served by permanently terminating the parental rights and by awarding custody to the agency. See R.C. 2151.414(A)(1). However, the adjudication that the child is an abused, neglected or dependent child may not be re-adjudicated at the hearing. See id.
R.C. 2151.414(B)(1) requires that a trial court determine whether the child's best interest would be served by the award of permanent custody and whether the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," before it grants permanent custody. Both the "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C. 2151.414(C) prohibits the trial court from considering the effect on the parent of granting permanent custody to the children services agency.
R.C. 2151.414(D) requires that the trial court consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The court must consider, in addition to any other relevant factors:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(E) sets forth the factors the trial court must consider in determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. The court must consider:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
of the Revised Code.
 (3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody.
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
* * *
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
* * *
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
* * *
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
A trial court may base its decision that a child cannot be placed with either parent within a reasonable time upon the existence of any one of the above factors. See In re Hurlow (Sept. 21, 1998), Gallia App. No. 98CA6, unreported; In re Butcher (Apr. 10, 1991), Athens App. No. 1470, unreported. When R.C. 2151.414(E)(1) forms the basis for the court's finding, the agency must have provided a case plan and time to remedy the situation that led to the removal of the children from the household. However, the other factors listed in R.C. 2151.414(E) do not require application of a case plan nor time to remedy the situation. In the Matterof Mark H. (Apr. 30, 1999), Lucas App. No. L98-1238, unreported.
When permanent custody is sought by motion, R.C. 2151.419 is also applicable. R.C. 2151.419(A)(1) requires that the court determine whether the children services agency that will be given custody of the child has made reasonable efforts to make it possible for the child to return safely home. The agency has the burden of proving that it made reasonable efforts. However, the child's safety and health are paramount in determining whether reasonable efforts were made. Under R.C.2151.419(A)(2), the court may determine that the agency is not required to make reasonable efforts to return the child to his or her home if any of the situations in R.C. 2151.414(E)(7) to (11) are present. An implied exception to the reunification efforts also exists where efforts to reunite would be futile. See In re Crosten (Mar. 21, 1996), Athens App. No. 95CA1692, unreported. However, a finding of futility must not be based on an appearance of futility created by an act or omission of the children services agency. In re Lawson (Apr. 18, 1997), Clark App. No. 96CA10, unreported.
Clear and convincing evidence must exist to support an award of permanent custody. The Supreme Court of Ohio has defined "clear and convincing" as follows:
 The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
 In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-104; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
Moreover, an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law. Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained inSeasons Coal v. Cleveland (1984), 10 Ohio St.3d 77, 80:
 The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.
Please attach to Judge Harsha's 12/12/00 opinion.
APPENDIX
The Record
On November 11, 1997, Mr. Boling severely beat Ms. Norris. Both parties were intoxicated at the time and Mr. Boling had also ingested valium. As a result of the beating, Ms. Norris was comatose and was hospitalized for a lengthy period of time. Following her hospitalization, she required rehabilitative treatment and still suffers some permanent disabilities from her injuries. Following this incident, Mr. Boling fled to Florida to avoid prosecution. He was captured after approximately two months and returned to Ohio where he pled guilty to felonious assault and was sentenced to four years imprisonment, beginning May 11, 1998.
The day following the assault, ACCS applied for and received an order of emergency temporary custody of Kristal (D.O.B. 2/26/88), Billy (D.O.B. 7/7/93), and Robert (D.O.B. 10/26/94). The children were placed in foster care with the McMillan family and a case plan was filed shortly thereafter indicating a goal of reunification with their mother. The case plan noted that Ms. Norris needed to make several changes including providing a home free from domestic violence, alcohol and marijuana, learning appropriate discipline techniques, and learning not to abuse alcohol.
In January 1998, the court ordered that Mr. Boling not have any contact with Ms. Norris or the children. In February 1998, the court adjudicated the children dependent based on Ms. Norris' inability to care for them due to her injuries. Mr. Boling was again ordered not to contact Ms. Norris or the children. An amended case plan was filed noting that Kristal's father's whereabouts were unknown and that Mr. Boling was currently incarcerated in Florida so no services could be offered.
Marie and Shirley Johnson, Ms. Norris' sister and brother-in-law, agreed to take legal custody of the children and the court transferred custody to the Johnsons with ACCS retaining protective supervision. Ms. Norris was ordered to maintain an adequate, stable, violence-free home and to be assessed for alcohol treatment. She was also ordered to follow through with any recommendations made regarding treatment.
While the children lived with the Johnsons in Lawrence County, Ms. Norris lived in a mobile home on their property. The purpose of this arrangement was to allow Ms. Norris to recover from her injuries without worrying about the care of the children. Her close proximity allowed her to gradually increase her responsibility for the children and see them on a regular basis.
According to Laurie Gribble, the ACCS caseworker assigned to Ms. Norris' case at the time, ACCS provided Ms. Norris with transportation, counseling referrals and drug and alcohol counseling during this period. Ms. Norris attended counseling sporadically though she did attend some Alcoholics Anonymous (AA) meetings for approximately four to five months. The children notified Ms. Gribble that their mother was leaving during their weekend visitations with her and going to Athens and Meigs Counties. Teena Nelson, a Lawrence County Social Services caseworker also assigned to the case, notified Ms. Gribble that Ms. Norris was still drinking in the spring of 1998. Ms. Norris told Ms. Gribble that she had problems controlling the boys because they were hyper. She was taking pills to control her nerves but she sometimes had to take a drink to calm her when it got too bad. In March 1998, a second amended case plan was filed changing the goal from reunification to permanent placement with the Johnsons.
John Curtiss, a former employee of the Family Guidance Center in Ironton, Ohio, testified that Ms. Norris was diagnosed with dominant alcohol abuse in March 1998. She indicated that she first started using chemicals and beer at age twenty-five and had one arrest for driving under the influence approximately eight years prior. She completed Project First Step, a group substance abuse program but denied that she was an alcoholic. On one occasion, a staff member smelled alcohol on Ms. Norris' breath though Mr. Curtiss did not personally smell it. Mr. Curtiss testified that Ms. Norris showed increased knowledge on the post-program test and interacted in some of the later sessions.
In December 1998, ACCS filed a motion to modify the disposition from protective supervision to temporary custody with ACCS. In its motion, ACCS indicated that the Johnsons wished to terminate their legal custody of the children because Ms. Norris was still drinking and was not spending time with the children. In January 1999, the court awarded temporary custody of the children to ACCS for six months but the children remained with the Johnsons.
Shortly thereafter, a third amended case plan was filed and the goal was changed back to reunification with Ms. Norris. The plan noted that Ms. Norris needed to attend drug and alcohol counseling, submit to urine screens and follow the counselor's recommendations. Further, no one visiting the home should be intoxicated or drinking alcohol.
In May 1999, legal custody of the children was returned to Ms. Norris but ACCS retained protective supervision. A fourth amended case plan was filed shortly afterwards stating that Ms. Norris must maintain complete sobriety, avoid others who abuse alcohol, not allow alcohol in the home, attend counseling at the Family Guidance Center, attended weekly AA meetings and permit random urine screens.
In August 1999, Rebecca Lehman, a caseworker for ACCS made a home visit to Ms. Norris' home. At the time, Ms. Norris was living in a trailer owned by Harold Barnhart. Ms. Lehman testified that the trailer was run-down. Ms. Norris told Ms. Lehman that one bedroom was Harold's, one was the boys' with a twin bed, and one was Kristal's. Ms. Norris slept on the couch. The walls of the trailer consisted of exposed insulation covered with plastic. The refrigerator and freezer had very little food. Ms. Lehman told Ms. Norris that Mr. Barnhart was a known alcoholic and living there was in conflict with her case plan. Ms. Lehman offered to help Ms. Norris find an appropriate apartment.
Jenny Byers, a counselor at Tri-County Mental Health and Counseling, testified that she assessed Ms. Norris on September 3, 1999 and eventually diagnosed her with anxiolytic dependency (specifically benzodiazepines) and alcohol dependency. Ms. Byers recommended that Ms. Norris meet with her once a week until she could begin attending the Substance Abuse and Mental Illness (SAMI) intensive outpatient group. Ms. Byers also spoke to Ms. Norris about attending a residential treatment program and Ms. Norris later agreed to attend the Rural Woman's Recovery Program (RWRP).
Marsha Lee Wikle, the guardian ad litem for the children, testified that she visited Ms. Norris' home in September 1999. When she arrived, Ms. Norris was sitting in the front passenger's seat of Cecil Stacey's car with the door open. Mr. Stacey was in the driver's seat. There were five or six fresh-looking beer cans laying next to the car on Ms. Norris' side. Ms. Wikle spent approximately one hour talking to Ms. Norris who never left the vehicle or turned to face Ms. Wikle. Ms. Norris appeared hunched over, incoherent and emotional, leading Ms. Wikle to believe she was intoxicated.
While Ms. Wikle spoke to Ms. Norris, the children went through Ms. Wikle's vehicle looking for food and drinks. They found a partial can of cola and a partial bottle of cranberry juice and drank both. Ms. Wikle encouraged Ms. Norris to leave the vehicle and feed the children but Ms. Norris still did not stand up. Ms. Wikle testified that Mr. Stacey did not appear intoxicated.
Ms. Wikle visited again a few days later. On that occasion, Ms. Norris had already fed the children though Ms. Wikle brought food with her because of her prior experience. The contrast in Ms. Norris' behavior confirmed Ms. Wikle's suspicion that Ms. Norris had been drinking a few days earlier. Ms. Wikle asked Ms. Norris about the beer cans and she admitted having three or four beers.
Ms. Lehman also went to Ms. Norris' home to inquire about the incident. Ms. Norris admitted drinking two beers and stated that Mr. Stacey had two beers. Ms. Norris also stated that Robert had been in the car. There was little food in the refrigerator though Robert stated that he had eggs for breakfast. One of the rooms in the trailer was filled with trash and there were numerous flies throughout the trailer. Ms. Norris indicated that she was attempting to move to the Carriage Hill apartments, which she eventually did in December 1999.
On October 4, 1999, Ms. Lehman conducted a semi-annual review with Ms. Norris at the ACCS office. When Ms. Lehman went to pick Ms. Norris up, she stopped at the laboratory for a drug and alcohol screen. Ms. Norris told Ms. Lehman that the test would not be clean because her birthday was the prior weekend and she had a couple of beers.
During the meeting, a case aide noticed a small, circular burn on Robert's knee that appeared scabbed over. The burn appeared to be shaped like a cigarette. Because the scab was above the knee and not on the front of it, it did not look like he fell and scraped it. Robert stated that his sister had punched him there. When asked if his mother did anything to make it feel better, he said no.
In October 1999, ACCS filed a motion for emergency custody. In their motion, ACCS noted that Ms. Norris had not complied with the case plan in that she did not maintain sobriety, did not attend counseling or regular AA meetings, did not submit to random urine screens and had not avoided other alcohol abusers. ACCS also indicated that the home the children were living in was not safe and there was little food in the home. Also, Robert had a cut under his eye and a burn on his leg that appeared to result from a cigarette. Emergency custody was granted to ACCS and the children were again placed in foster care with the McMillans.
Jill Newstate, a registered nurse, testified that she examined Robert after his removal from his mother's custody. Robert had a one-half centimeter cigarette-like burn on the right lateral of his tongue. His left knee had an open round sore with a multi-layered scab. He also had blisters on his feet and scattered scabs on the right side of his face. Ms. Newstate did not know how Robert received the burn or the wound or how old either was.
In November 1999, a fifth amended case plan was filed, adding an additional case plan objective. Based on the recommendation of Jenny Byers, Ms. Norris' counselor at Tri-County Mental Health and Counseling, ACCS added the objective of inpatient alcohol treatment.
Ms. Lehman testified that she visited Harold Hudnell's trailer on November 10, 1999. Mr. Hudnell and Ruth, Ms. Norris' sister, were drinking. Ruth asked Ms. Lehman, referring to Robert, "How is the little red-headed fucker doing?" Two days later, Ms. Norris told Ms. Lehman, in front of the children, that Mr. Hudnell and another male friend had a debate about who would take Ms. Lehman out and they made a comment about her legs. Ms. Lehman told Ms. Norris that this was inappropriate to say in front of the children.
Ms. Norris entered the RWRP in the beginning of January 2000 and remained there approximately two weeks until January 24, 2000, though the normal program length is one to three months. Kathryn Chelak, Ms. Norris' counselor at RWRP, testified that Ms. Norris gave her varying reports of how long it had been since her last drink. Ms. Norris stated that it had been two to three months on one occasion and a week or so on another occasion. Ms. Norris told Ms. Chelak she had been drinking intermittently for ten to fifteen years.
Ms. Chelak testified that Ms. Norris failed to recognize that many of her problems stemmed from her drinking. She participated only minimally in the groups at the clinic. Her statements indicated that while she was physically present, she did not feel the issues pertained to her. Ms. Norris and Ms. Chelak attended a meeting on January 18, 1998 with Ms. Byers, Ms. Lehman and other employees of RWRP to identify why Ms. Norris needed to be in treatment. Ms. Lehman informed Ms. Norris that her completion of the program was important to the determination of her children's custody and that she was in danger of permanently losing her children if she failed to comply with the recommendations of her counselor as required by her case plan. This information caused Ms. Norris to cry and she appeared upset. Despite this meeting, Ms. Norris left RWRP against the staff's advice.
After Ms. Norris left, Ms. Byers recommended that she attend the SAMI group, attend weekly counseling and attend AA meetings five times per week until a place in the SAMI group was available. Ms. Norris attended approximately fifteen AA meetings between February 2 and February 23, 2000. She began attending the SAMI group on March 6, 2000. Ms. Byers testified that Ms. Norris appeared healthier and was taking better care of her appearance now than when she first met her. She also appeared to have more will and motivation. Ms. Byers noted that it was important that Ms. Norris have a relapse prevention plan including a support network of people she can rely upon who do not drink or use substances.
In January 2000, ACCS filed a motion for permanent custody. In its motion, ACCS indicated that Mr. Boling was not eligible for parole until February 2002, that attempts to locate Mr. Norris had failed, and that Ms. Norris had not complied with her case plan and was unable to care for the children. The court conducted a four-day hearing in May 2000.
Iris Norris testified that she has lived in a three-bedroom apartment since December 23, 1999. She lived in Harold Barnhart's trailer from August or September 1999 until she moved into her apartment. While she lived in Mr. Barnhart's trailer, a friend of his would sleep there during the day while the children were at school but she could not recall his name. Prior to that, she lived in a trailer on her sister, Marie's, property in Lawrence County.
Ms. Norris testified that the children were not present on the night Mr. Boling beat her. As a result of the beating, she had a blood clot on her brain, a broken neck, a dislocated hip, her arms were pulled out of their sockets, and her teeth were kicked out. Ms. Norris testified that prior to that incident, Mr. Boling slapped her around almost every day, usually when the children were in bed. She did not know if the children heard but it was loud enough to wake the neighbors. On two occasions, Ms. Norris obtained a restraining order against Mr. Boling, but he continued to live with her and the children. She stayed with Mr. Boling because he told her the boys needed their father. Ms. Norris testified that Mr. Boling was not close to the boys and has not seen or contacted them since November 1997. Ms. Norris testified that she did not see a burn mark on Robert in October 1999 and she does not believe he had one. She stated that she is the only person who smoked and she would not burn her children. Ms. Norris surmised that Robert may have gotten her lighter and "flicked it on his leg or something." She stated that he knows how to light the lighter and a cigarette.
Ms. Norris testified that she did not drink when she was in her twenties and started drinking about eight years ago. She previously attended an outpatient alcohol counseling program two or three times a week. She recently completed the SAMI program and intended to continue with the next stage of the program. She left RWRP because she didn't like her roommate and doesn't consider herself an alcoholic. Ms. Norris also testified that an unknown doctor at RWRP told her she was not an alcoholic because she did not have the "shakes" after two or three days. She stated that Becky Lehman never informed her that she may lose her children if she left RWRP and she would have stayed if she had that information. Ms. Norris also testified that she attended AA meetings for five weeks until she entered the SAMI program, but does not know which of the twelve steps she completed.
Ms. Norris testified that she has not had a drink in almost eight months. Even when she was drinking, she only drank about a six pack of beer per week. Ms. Norris testified that when she drank she got a babysitter and did not drink around her children. She stated that the last time she drank was on her birthday in October 1999 and she limited herself to five beers on the weekend. Ms. Norris admitted that when Ms. Wikle saw her drinking with Mr. Stacey, he had been driving with her children in the car after drinking beer. She also testified that she does not allow others to drink in her home, though many of her friends drink.
Ms. Norris testified that she believes she has done everything ACCS asked her to do. She testified that she had food in the house and cooked for the children when they lived with her. However, Ms. Norris admitted that she did not attend parenting classes though the caseworkers had suggested them. She stated that she didn't know why she did not attend, she either didn't have time or did not want to. However, she would attend them in order to regain custody of her children. Ms. Norris testified that she would not start drinking again because her children meant too much to her. She also indicated that she would stop associating with her friends and her sister if it meant getting her children back.
Ms. Norris testified that her sister, Ruth, visits infrequently to assist Ms. Norris with her laundry and cooking. She further stated that people who drink alcohol were allowed in her home as long as they were sober and didn't bring alcohol with them. Ms. Norris testified that she has a relapse prevention program in place. If she feels like having a drink she will talk to a family member or friend, get a hobby, call someone from AA, talk to her sponsor, or go to an AA meeting. Ms. Norris testified that she last spoke to her sponsor eight weeks ago.
Cecil Stacey testified that he has known Ms. Norris since 1982 and they have two sons together who live with Mr. Stacey. Ms. Norris was in her late twenties when they lived together and she drank beer then but he never saw her smoke marijuana. The last time Mr. Stacey saw Ms. Norris was when he brought her home and the guardian ad litem visited Ms. Norris' home. He was unsure of the date but indicated that the kids did not seem hungry and Ms. Norris had plenty of groceries. He testified that Ms. Norris drank approximately three or four beers on that date. Later in his testimony, Mr. Stacey indicated that he saw Ms. Norris at Harold Hudnell's home around Christmas time. Mr. Stacey testified that Mr. Hudnell drinks and is a good friend of Ms. Norris. Mr. Stacey also knows Harold Barnhart, who drinks a lot, though Mr. Stacey never saw Ms. Norris drink with him. Mr. Stacey testified that Ms. Norris has a drinking problem, but he did not believe she is currently drinking.
Marsha Lee Wikle testified that she has visited Ms. Norris' new apartment on two occasions, but Ms. Norris was not home either time. She has also attended several visits between Ms. Norris and her children. During these visits, Ms. Norris was not observant of the children's behaviors. When she did reprimand the boys, they ignored her even when they were doing something dangerous. The boys would leave Ms. Norris and she would not know where they'd gone or attempt to follow them. Kristal paid more attention to her mother though.
Ms. Wikle testified that the children interact more with their foster parents than with Ms. Norris. Ms. Wikle has had no personal contact with Mr. Boling or Mr. Norris. Mr. Boling was in Florida when she was first assigned to the case and then was incarcerated. Ms. Wikle recommends that permanent custody be granted to ACCS because Ms. Norris has had several opportunities to redirect her life and has failed to do so, though ACCS provided her with many resources. Ms. Wikle indicated that even if Ms. Norris is currently sober, she does not believe that placement of the children with her would be appropriate as Ms. Norris has never been able to maintain her sobriety with the children in the home.
Cynthia Warren, a counselor at Tri-County Mental Health and Counseling Services, testified that she has worked with all three children to stabilize their moods and behaviors. When she first began counseling, Kristal exhibited signs of anxiety and depression. She also had a low self-image and was very withdrawn. Kristal has improved and has begun to talk about difficulties and make more eye contact. Robert was highly emotional when he first began seeing Ms. Warren. He would become extremely upset about small things and easily frustrated. He is now more relaxed and his moods are more stable. Billy was extremely hyperactive when he began counseling. He was difficult to focus and would move from one activity to another very rapidly. He is now much more stable, relaxed and friendly. Billy and Kristal were diagnosed with adjustment disorder with mixed anxiety and depression. Robert was diagnosed with adjustment disorder with mixed emotions and conduct. Ms. Warren testified that Kristal has warm feelings towards her mother, but she recommends that all three children remain in their foster home.
Anita Hudnell testified that she is twenty-three years old. Ms. Norris is her mother and Harold Hudnell is her father. Ms. Hudnell testified that her mother has admitted she's an alcoholic and that when Ms. Hudnell was a child her mother laid around and drank all the time, though she always had food for the children. Ms. Hudnell further testified that Ms. Norris was mean when she drank and that she and Mr. Boling would get into fights in front of the children, cussing and spitting at each other. The children would scream and cry when they saw the fights.
Ms. Hudnell testified that Mr. Boling was cruel to Ms. Norris, burning her legs with cigarettes and spitting on her. He was also mean to Billy and Robert. On one occasion, when Billy was about one-and-a-half years old, Mr. Boling crammed Billy's mouth full of food, held his hand over his mouth and nose, and held him by his feet over the top of the well and said he was going to drop him in it. Ms. Hudnell also saw Mr. Boling slap Kristal in the face within the last five years. Mr. Boling was a heavy drinker who drank every day Ms. Hudnell was at their home. Ms. Hudnell testified that Mr. Boling would not be an appropriate caretaker for the boys because he is too mean and she would be scared to have him around her brothers. Ms. Hudnell testified that the last time Mr. Norris had contact with Kristal was in 1993 or 1994.
Ms. Hudnell also testified that she believes Ms. Norris could provide a stable household for the children now. She has quit drinking and has her own place to live. Ms. Hudnell has seen other people, including Harold Barnhart, drinking in Ms. Norris' current home but has not seen her drink. Ms. Hudnell admitted that Ms. Norris has quit drinking in the past but started drinking again.
On re-direct examination, Ms. Hudnell admitted that she has smoked marijuana with her mother before though the last time was several years prior. She also testified that her aunt, Ruth, helps her mother with laundry and other chores and stays with her mother part-time. Ruth sometimes drinks heavily.
Karen Blevins, Ms. Norris' twenty-five-year-old daughter, testified that Ms. Norris and Mr. Boling fought all the time. They also drank a lot, sometimes until one or two a.m. Ms. Blevins observed Mr. Boling smack Kristal and Billy once. She also testified that she never saw the boys with Mr. Boling when Ms. Norris was not around or saw him taking care of them on his own. The last time she saw her mother drink was in October 1999.
Ms. Blevins also testified that a mouse bit Robert on the finger while Ms. Norris and the children were living in Harold Barnhart's trailer. He had a fever but Ms. Norris never took him to the doctor. Ms. Blevins indicated that he did not appear to be too sick.
On cross-examination, Ms. Blevins testified that when she was approximately fifteen years old she would take care of Kristal sometimes when her mother was out drinking. She also cooked for her mother when she was intoxicated. Ms. Blevins stated that when she picked Ms. Norris up for court one morning during the hearing, Harold Barnhart was at Ms. Norris' apartment. Mr. Barnhart has a reputation as a drinker.
Shirley McMillan, the children's foster mother, testified that she had the children in her care in 1997 until they went to their aunt's home and again in October 1999. The first time they came into her care, the children were hyper, vomited a lot, and "messed in their pants." A physician could find no physical cause for these behaviors. The children also seemed not to care about very much and were educationally behind when they entered Mrs. McMillan's care. The children were excited about going to live with their aunt and uncle and their behaviors had generally improved when they left in February 1998.
However, when they returned to the McMillan home in October 1999, many of these bad behaviors were present again. The boys appeared "wilder" the second time and also exhibited sexual behavior. On one occasion, Robert jumped on Mrs. McMillan's son's leg and said he was going to "hump him." Mrs. McMillan asked Robert what he meant by that and he stated that you kiss, jerk your clothes off, run in the bedroom and hump. When she asked where he learned that, Robert stated that his Aunt Ruth does it all the time. Billy frequently plays with his genitals and Robert jerks his pants up and down, telling people to look at him. Robert told Mrs. McMillan that his Aunt Ruth told them to do these things. These behaviors are usually especially bad for about two days after they visit with their mother. Kristal writes letters to boys and has made inappropriate comments to Mrs. McMillan's sixteen-year-old grandson.
The two boys are now taking ritalin which has decreased their hyperactivity. They are also beginning to learn right from wrong. Mrs. McMillan testified that the children tell her they love her and seem happy. She is willing to have the children remain in her home though no one has asked her about adopting them. Mrs. McMillan has not met Mr. Boling and he has never contacted her or the boys.
Ms. Lehman testified that ACCS provided numerous services to Ms. Norris including transportation, counseling, visitations, information referrals, testing for the children, help locating an apartment, and money for furniture. Ms. Lehman contacted the children's siblings as well as the Johnsons regarding custody. The agency was unable to locate most of their paternal family. None of the relatives wished to have the children placed with them.
Ms. Lehman indicated that the Carriage Hill apartment seems appropriate, but that Ms. Norris is still associating with family and friends who are known to abuse alcohol and other substances. During visitation with the children, Ms. Norris generally brings junk food and/or toys that the children are very interested in. Kristal interacts with her mother but Ms. Lehman expressed concern regarding their conversations. On one occasion, Kristal told her mother she received a note from a boy calling her a "sexy thing" and Ms. Norris laughed. Ms. Lehman told Ms. Norris that such behavior was inappropriate. Ms. Lehman indicated that the children hug their mother when they arrive and when they leave.
While Ms. Norris has made strides in what she has been asked to do, Ms. Lehman stated that she has never taken responsibility for what has happened to the children. Ms. Lehman expressed concern because Ms. Norris' support network consists of alcohol and drug users who are not a secure safety net for herself or her children. Mr. Boling has had no interaction with the children and Ms. Lehman has been unable to locate Mr. Norris. Ms. Lehman testified that she did not have any contact with Mr. Boling because he was incarcerated. When she contacted Warren Correctional Institution on December 16, 1999, she was told he was not eligible for release for two more years so she did not include him in the case plan. She recently learned that he is currently at SEPTA.
Ms. Lehman believes Ms. Norris has failed to comply with the case plan and that her home would not be a safe and stable home for the children. Ms. Lehman expressed concern regarding the people Ms. Norris associates with, especially Ruth Donahue, as well as her failure to complete inpatient treatment and her lengthy history. Ms. Lehman admitted that Ms. Norris has had no positive urine screens but noted that alcohol leaves the body quickly and is therefore difficult to detect. She noted that her observations indicate that Ms. Norris does not have the skills to protect her children or to discipline them and sometimes did not recognize dangerous situations.
Mr. Boling testified that he is currently residing at SEPTA but prior to that he was at the prison in Warren after pleading no contest to felonious assault. He testified that on the evening of the assault, he drank whiskey and beer and took some valium. He does not recall hurting Ms. Norris but believes he did so. Mr. Boling testified that the children were approximately fifty yards away at the time but he does not believe they heard anything. The morning after the assault, Mr. Boling took Ms. Norris to the hospital and brought the children to Harold Hudnell's home. He then fled to Florida because he was scared.
During his prison stay, Mr. Boling passed the adult basic education test, attended a pre-GED class, and earned certificates for classes in self-discipline, self-awareness, anger management, and chemical dependency and alcohol addiction. He is still working on his GED. Mr. Boling testified that he learned that he is an alcoholic and how alcohol affects one's body. He has been clean for two years now and does not intend to start drinking again when he is released from SEPTA. Mr. Boling testified that there were opportunities to consume alcohol and marijuana in prison but that he did not do so.
Mr. Boling also testified that he would like to be reunited with his sons someday and would be willing and able to provide a home for them. He could earn a living painting either in Ohio or in Florida, where his brother owns a painting business. Mr. Boling was aware of the order prohibiting him from contacting his sons. He did not, however, know the boys had been removed from Ms. Norris' care until January 2000 when he received papers from the court. That was his first opportunity to apply for counsel.
Mr. Boling denied ever physically harming or smashing food in his sons' faces. He also indicated that he treated Kristal just like he did his own sons. Mr. Boling testified that he had not hit Ms. Norris when she got the restraining order but admitted hitting her in the head once when he was upset. He indicated that Ms. Norris was violent toward him, slapped him and broke his nose once. Mr. Boling testified that Ms. Norris is a good mother when she is not drinking and hanging around a bad crowd, including Harold and Anita Hudnell and Ruth Donahue.
Mr. Boling testified that he received a judicial release because he stayed out of trouble, went to classes, and wrote the judge a letter. He was scheduled to be released from SEPTA on September 16, 2000.
Following the hearing, the court granted ACCS's motion for permanent custody and terminated the parental rights of Iris Norris, Robert Boling and Michael Norris. Mr. Boling requested findings of fact and conclusions of law that the court issued. Both Ms. Norris and Mr. Boling appealed from this judgment.
B. The Applicable Law
In considering a motion for permanent custody filed under R.C. 2151.413, the trial court must follow the guidelines delineated in R.C. 2151.414. R.C. 2151.414(A)(1) requires the trial court to conduct a hearing to determine whether the child's best interests would be served by permanently terminating the parental rights and by awarding custody to the agency. See R.C. 2151.414(A)(1). However, the adjudication that the child is an abused, neglected or dependent child may not be re-adjudicated at the hearing. See id.
R.C. 2151.414(B)(1) requires that a trial court determine whether the child's best interest would be served by the award of permanent custody and whether the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," before it grants permanent custody. Both the "best interest" determination and the "cannot be placed with either parent" determination focus on the child, not the parent. R.C. 2151.414(C) prohibits the trial court from considering the effect on the parent of granting permanent custody to the children services agency.
R.C. 2151.414(D) requires that the trial court consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The court must consider, in addition to any other relevant factors:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(E) sets forth the factors the trial court must consider in determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. The court must consider:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353
of the Revised Code.
 (3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody.
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
* * *
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
* * *
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
* * *
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
A trial court may base its decision that a child cannot be placed with either parent within a reasonable time upon the existence of any one of the above factors. See In re Hurlow (Sept. 21, 1998), Gallia App. No. 98CA6, unreported; In re Butcher (Apr. 10, 1991), Athens App. No. 1470, unreported. When R.C. 2151.414(E)(1) forms the basis for the court's finding, the agency must have provided a case plan and time to remedy the situation that led to the removal of the children from the household. However, the other factors listed in R.C. 2151.414(E) do not require application of a case plan nor time to remedy the situation. In the Matterof Mark H. (Apr. 30, 1999), Lucas App. No. L98-1238, unreported.
When permanent custody is sought by motion, R.C. 2151.419 is also applicable. R.C. 2151.419(A)(1) requires that the court determine whether the children services agency that will be given custody of the child has made reasonable efforts to make it possible for the child to return safely home. The agency has the burden of proving that it made reasonable efforts. However, the child's safety and health are paramount in determining whether reasonable efforts were made. Under R.C.2151.419(A)(2), the court may determine that the agency is not required to make reasonable efforts to return the child to his or her home if any of the situations in R.C. 2151.414(E)(7) to (11) are present. An implied exception to the reunification efforts also exists where efforts to reunite would be futile. See In re Crosten (Mar. 21, 1996), Athens App. No. 95CA1692, unreported. However, a finding of futility must not be based on an appearance of futility created by an act or omission of the children services agency. In re Lawson (Apr. 18, 1997), Clark App. No. 96CA10, unreported.
Clear and convincing evidence must exist to support an award of permanent custody. The Supreme Court of Ohio has defined "clear and convincing" as follows:
 The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
 In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-104; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
Moreover, an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law. Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained inSeasons Coal v. Cleveland (1984), 10 Ohio St.3d 77, 80:
 The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.